AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the  
Central District of Illinois

| | |
|---|---|
| United States of America<br>v.<br><br>Wardell M. Dockery<br><br>*Defendant(s)* | Case No.  20-MJ- 7053 |

FILED  
MAR 12 2020  
CLERK OF THE COURT  
U.S. DISTRICT COURT  
CENTRAL DISTRICT OF ILLINOIS  
URBANA, ILLINOIS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __March 10, 2020__ in the county of __Champaign__ in the __Central__ District of __Illinois__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §841(a)(1) and (b)(1)(A) | Possession of 50 Grams or More of Methamphetamine (Actual) with Intent to Distribute |

This criminal complaint is based on these facts:
See ATF Task Force Officer Cully Schweska's affidavit, which is attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

_____  
*Complainant's signature*  
ATF TFO Cully Schweska  
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/12/2020

_____  
*Judge's signature*  
Eric I. Long, United States Magistrate Judge  
*Printed name and title*

City and state:  Urbana, Illinois

# AFFIDAVIT

I, Cully Schweska, being first duly sworn, hereby depose and state as follows:

1. I am a police officer with the Champaign Police Department and have been so employed since January 2013. I am currently assigned to the Investigations Division as a detective, with a primary function of investigating felony offenses under the Illinois Compiled Statutes, including firearms and drug-related offenses. I am also currently assigned as a task force officer (TFO) for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so assigned for one year. In my role as a TFO for the ATF, I investigate violations of Title 18 of the United States Code, as amended, including firearms-related offenses. Prior to my employment with the Investigations Division of Champaign Police Department, I was a member of the Street Crimes Task Force for approximately three years. In this role, I was responsible for the investigation of firearm- and narcotics-related investigations.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. This affidavit is submitted in support of a complaint charging **WARDELL M DOCKERY** (███████████), with the possession of 50 grams or more of methamphetamine (actual), a Schedule II controlled substance, with the intent to distribute, in violation of Title 21, United States Code, Sections 841 (a)(1) and (b)(1)(A).

1

## PROBABLE CAUSE

### Controlled Purchase

4.  On February 20, 2020, officers/agents met with a confidential informant (CI) for the purpose of conducting a controlled purchase of one-half ounce (14 grams) of crystal methamphetamine by the CI from DOCKERY. The CI made a recorded phone call to DOCKERY at ███████████, and a male identified by the CI as DOCKERY answered. The CI and DOCKERY agreed to meet at a specific location within the Central District of Illinois in Champaign, Illinois, to conduct the exchange. Prior to this meeting, the CI and his/her vehicle were searched for currency and contraband with negative results. The CI was then provided with OAF and equipped with audio/video recording devices. The CI then entered his/her vehicle, and proceeded directly to the prearranged meet location to wait for DOCKERY to arrive, while officers/agents maintained constant visual surveillance of the CI.

5.  After the CI arrived at the buy location, DOCKERY was observed by surveilling officers exiting the residence located at ███ ██████████, Urbana, Illinois. DOCKERY then entered the driver's seat of the Chrysler 300 and traveled directly to the buy location and parked.

6.  Upon DOCKERY's arrival at the buy location, the CI exited his/her vehicle and entered the front seat of the Chrysler. Approximately one minute later, the CI exited DOCKERY's vehicle and returned to his/her vehicle while officers/agents maintained constant visual surveillance of the CI and DOCKERY. The CI was followed

until he/ she met officers/ agents at a pre-arranged location while other officers/agents maintained constant visual surveillance of DOCKERY and the Chrysler as he traveled directly back to the ▮▮▮▮▮▮▮ residence in Urbana, Illinois.

7. After the Chrysler arrived back at ▮▮▮▮▮▮▮, Urbana, Illinois, officers observed DOCKERY exited the vehicle and utilize keys to gain entry into the residence.

8. Officers/ agents met with the CI following the controlled purchase. The CI provided officers with the purported crystal methamphetamine that the CI had purchased from DOCKERY. The CI stated when he/ she arrived at the pre-arranged meet location he/ she had contacted DOCKERY via telephone. The CI stated he/ she awaited DOCKERY's arrival, then exited his/ her vehicle as DOCKERY parked. The CI entered the front passenger seat and observed DOCKERY as the sole occupant of the vehicle. DOCKERY handed the CI a quantity of crystal methamphetamine and in exchange, the CI handed DOCKERY $360 dollars of Official Advanced Funds (OAF). DOCKERY. The CI also had a brief conversation with DOCKERY, which was recorded on a covert audio/video recording device.

9. Your affiant reviewed the audio/video recording obtained from the CI. This recording depicts the CI meeting with DOCKERY at the pre-arranged meet location. The CI can be seen exiting his/ her vehicle and entering the front passenger seat of the silver Chrysler 300. The CI and DOCKERY can be observed having a conversation, during which DOCKERY's face is readily identifiable in the video.

3

DOCKERY can be seen extending his arm toward the CI in the front passenger seat, and can then be observed holding currency. DOCKERY then can be observed placing currency near the cup holder of the vehicle as the CI and DOCKERY have a brief conversation. A few seconds later, the CI exits DOCKERY's vehicle and returns to officers/ agent's location.

10. The purported crystal methamphetamine obtained from DOCKERY by the CI was field-tested, returning a positive result for methamphetamine. The substance approximately 14.9 grams with packaging and appeared consistent with high-quality methamphetamine sold within Champaign County. The substance has been sent to the Drug Enforcement Administration (DEA) forensic laboratory for analysis, though the results are pending. Based on my training and experience, as well as on information obtained from other law enforcement officials, I am familiar with the purity of methamphetamine sold and distributed in the Central District of Illinois. Methamphetamine sold within the CDIL is often high in purity, with lab analyses generally returning purity levels in excess of 85%. Based on the high purity of methamphetamine sold in central Illinois, together with my observation of the substance, I believe this substance distributed by DOCKERY on February 20, 2020, will be in excess of five grams of actual (pure) methamphetamine.

## Search Warrants

11. On March 10, 2020, your affiant obtained federal search warrants for the known residences of WARDELL M DOCKERY, located at ███ ████████ ████ in Urbana, Illinois 61802 and ███ ██████ █████████ in Champaign, Illinois 61821.

12. ATF Agents, Champaign Police Investigators and the Champaign Street Crimes Task Force (CSCTF) formulated a plan to arrest DOCKERY for distributing methamphetamine within the Central District of Illinois while DOCKERY was previously scheduled to meet with his parole officer on March 10, 2020. Prior to this meeting, officers/ agents established surveillance outside ███ ████████ ████ in Urbana, Illinois and outside ███ ██████ █████████, Champaign, Illinois, prior to the pre-arranged meeting. DOCKERY was observed exiting the residence at ███ ████████ ████████ and entering a white-colored sedan. DOCKERY was followed by law enforcement from ███ ██████ █████████ to the parole office in Champaign, Illinois, for his meeting.

13. At approximately 11:02 a.m., Champaign Police Detective Corey Phenicie and I arrested DOCKERY, and he was advised of his *Miranda* warnings. We advised DOCKERY that ATF had been investigating him for the distribution of methamphetamine. We then asked DOCKERY if there was any methamphetamine at his residences located at ███ ████████████ Urbana, Illinois and/ or ███ ██████ ████ Champaign, Illinois. DOCKERY denied residing at either ███ ████████████ in Urbana, Illinois, or ███ █████████ in Champaign, Illinois.

14. Detective Corey Phenicie and I transported DOCKERY to ▬▬ ▬▬▬▬, Champaign, Illinois, first. DOCKERY once again denied knowledge of the residence. At approximately 11:35 a.m., ATF and the CSCT agents executed the warrant at ▬▬ ▬▬▬▬ ▬▬▬▬▬. Agents located one female occupant inside the residence, who was later released. This female identified herself as being in a physical relationship with DOCKERY. Inside, officers/ agents located indicia of residence for DOCKERY inside the north bedroom, including but not limited to, a social security card, a birth certificate, Illinois Voter Registration receipt, a copy of his Illinois Identification card, Illinois Department of Corrections paperwork in his name, and Carle Hospital paperwork for a health visit. In the same bedroom, agents also located 14.4 grams of suspected oxycodone in a bag, a large amount of United States Currency, and receipts for expensive jewelry.

15. During the search of the rest of residence, agents located three (3) plastic tubes containing suspected "ice" methamphetamine, inside of a black duffel bag behind the couch in the living room, which were later weighed in their plastic packaging. The tubes weighed approximately 504.4 grams, approximately 504.2 grams and 504.8 grams. The suspected methamphetamine was field-tested, and field-tested positive for the presence of methamphetamine. The methamphetamine weighed approximately 1,513.4 grams in total, with packaging. The methamphetamine will be sent to the DEA North Central Laboratory for further analysis. From training and experience, I know that 1,513.4 grams of methamphetamine is a distribution amount of methamphetamine and not an amount commonly held for personal use.

16. Also located in the living room was one (1) loaded Beretta 92A1 semiautomatic 9mm handgun with an extended magazine, one (1) loaded Ruger P85 9mm semiautomatic handgun and one (1) Draco 7.62x 9mm semiautomatic pistol and various rounds/ calibers of ammunition.

17. Located in the kitchen were several bags of suspected powder cocaine. The bags of suspected cocaine weighed (approximately) the following: 56.2 grams, 14.8 grams, 5.1 grams, 3.0 grams, 56.4 grams, 172.3 grams and 207.4 grams. Total, the suspected powder cocaine located in the kitchen weighed approximately 515.2 grams, with packaging. Additionally, officers located approximately 46.4 grams of suspected crack cocaine in the kitchen. The suspected cocaine and crack cocaine were field-tested, and field-tested positive for the presence of cocaine. The cocaine has been secured into the Champaign Police Evidence Unit. Based on my training and experience, I know that 515.2 grams of suspected cocaine and 46.4 grams of suspected crack cocaine are distribution amounts of cocaine and not an amount commonly held for personal use.

18. Additionally, officers/ agents located a bag containing suspected "ice" methamphetamine, inside of the kitchen drawer that was later weighed in its plastic packaging. The suspected methamphetamine was field-tested, and field-tested positive for the presence of methamphetamine. This bag of methamphetamine weighed approximately 378.9 grams, with packaging. The methamphetamine will be sent to the DEA North Central Laboratory for further analysis. From training and experience, I know that 378.9 grams of methamphetamine is a distribution amount of methamphetamine and not an amount for personal use.

19. Located inside the kitchen was also packaging material consistent with narcotics sales. These materials included gallon Ziploc bags and a digital scale. Also, a glass Pyrex jar and utensil in kitchen sink with suspected cocaine residue, which based on my training and experience, are tools commonly utilized to cook crack cocaine. An additional large amount of United States Currency was located in a shoebox in the laundry room.

20. A second bedroom is also located in the northeast corner of the residence at ▇▇▇▇▇▇▇. This bedroom had indicia of residency for Robert Williams. The search of this bedroom revealed a semiautomatic handgun and suspected Viagra (sildenafil).

21. The total amount of narcotics located inside the residence of ▇▇▇▇▇ ▇▇▇▇ within the common areas or the bedroom with indicia of residency belonging to DOCKERY were as follows:

   a. 14.4 grams of oxycodone;
   b. 515.2 grams of powder cocaine;
   c. 46.4 grams of cocaine base ("crack"); and
   d. 1,892.3 grams of methamphetamine ice.

22. Officers/ agents then proceeded to DOCKERY's second residence, ▇▇▇ ▇▇▇▇▇▇▇ in Urbana, Illinois to execute the second search warrant. At approximately 11:57 a.m., ATF and Champaign County Street Crimes Task Force officers served the search warrant at said residence. Officers/ agents located one female, identified as DOCKERY's girlfriend, inside the residence. I advised the female of her rights pursuant to *Miranda*. She advised, in summary, that DOCKERY is her

8

boyfriend and that they reside at ███ ███████ Urbana, Illinois. She stated she and DOCKERY are the only two who have keys and access to the residence at ███ ███████ and that they share the master bedroom located inside in the trailer.

23. The subsequent search of the trailer at ███ ███████ revealed a gray-colored bag in the kitchen drawer of the residence. Inside this gray bag was a bag containing suspected "ice" methamphetamine. The methamphetamine weighed approximately 284 grams, with packaging. The methamphetamine will be sent to the DEA North Central Laboratory for further analysis. From training and experience, I know that 284 grams of methamphetamine is a distribution amount of methamphetamine and not an amount commonly held for personal use. The bag also contained approximately eleven (11) pills of suspected ecstasy (MDMA), and approximately two bags of suspected crack cocaine weighing a total of 1.5 grams with packaging. The methamphetamine and cocaine will be sent to the DEA's North Central Laboratory. The ecstasy was submitted to the Champaign Police Evidence Unit for storage.

24. Officers/ agents then conducted a search of the master bedroom of the trailer. A search of the master bedroom revealed approximately 1,672.5 grams of suspected cannabis in the bedroom closet. Law enforcement also located a Taurus 9mm semiautomatic handgun in the same closet. Officers/ agents also located a large amount of currency in the dresser drawer.

25. Based on the facts stated above, I submit that there is probable cause to believe that Wardell DOCKERY possessed 50 grams or more of methamphetamine and that he possessed the same with intent to distribute it, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B).

FURTHER AFFIANT SAYETH NOT.

Cully Schweska, Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me this 12 day of March, 2020.

HONORABLE ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE